# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### (WESTERN DIVISION)

| | |
|---|---|
| JOHN DUDENHOEFFER, ALIREZA PARTOVIPANAH, *et al.*, | Civil Action No.:1: 08cv538 |
| Plaintiffs, | |
| vs. | |
| FIFTH THIRD BANCORP, *et al.*, | |
| Defendants. | |

## CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiffs John Dudenhoeffer and Alireza Partovipanah ("Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Fifth Third Bancorp ("Fifth Third" or the "Company"), including the Company's proxy statements (Form 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), and the annual reports (Form 11-K) filed on behalf of the Fifth Third Bancorp Profit Sharing Plan (the "Plan"); a review of the Form 5500s filed by the Plan with the U.S. Department of Labor ("DOL"); interviews with participants of the Plan; and a review of available documents governing the operations of the Plan. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.     NATURE OF THE ACTION

1.     This is a class action brought on behalf of the Plan, pursuant to § 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2), against the fiduciaries of the Plan for violations of ERISA.

2.     The Plan is a retirement plan sponsored by Fifth Third.  *See* Summary Plan Description of The Fifth Third Bancorp Master Profit Sharing Plan (as of August 8, 2007) ("2007 SPD") at FTB000257; Summary Plan Description of Fifth Third Bancorp Master Profit Sharing Plan (as of October 1, 2008) ("2008 SPD") at FTB000501.  True and correct copies of the 2007 SPD and 2008 SPD are attached hereto and incorporated as Exhibit A and Exhibit B, respectively.

3.     Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the period July 19, 2007 through the present (the "Class Period").

4.     Defendants allowed the imprudent investment of the Plan's assets in Fifth Third common stock ("Fifth Third Stock") throughout the Class Period, even though they knew or should have known that such investment was unduly risky and imprudent.  The Company's serious mismanagement and improper business practices led to, *inter alia,* the artificial inflation of Fifth Third Stock and created dire financial circumstances for the Company.  As a result, Fifth Third Stock was an unduly risky and inappropriate investment option for Plan participants' retirement savings during the Class Period.

5.     Therefore, Plaintiffs allege in Count I that certain Defendants, each having specific responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to the Plan and Plan participants by failing to prudently and loyally manage the Plan's investment in Company securities by (1) continuing to offer Fifth Third Stock as a Plan investment option when it was imprudent to do so; (2) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in Fifth Third Stock; and (3) maintaining the Plan's pre-existing investment in Fifth Third Stock when Company stock was no longer a prudent investment for the Plan.  These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.     In Count II, Plaintiffs allege that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Fifth Third Stock as an investment option and investing Plan assets in Fifth Third Stock when it was no longer prudent to do so.

7.     In Count III, Plaintiffs allege that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with the best interests of the Plan and Plan participants solely in mind.

8.     In Count IV, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries by knowing of breaches of fiduciary duties and failing to

remedy them, knowingly participating in the breaches of fiduciary duties, and/or enabling the breaches of fiduciary duties.

9.   As is more fully explained below, during the Class Period, Defendants with responsibility for the Plan's investments imprudently permitted the Plan to hold and acquire hundreds of millions of dollars in Fifth Third Stock despite the Company's serious mismanagement and improper business practices.  Based on publicly available information for the Plan, Defendants' breaches have caused tens of millions of dollars of losses to the retirement savings Plan.

10.   This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition to money damages, Plaintiffs seek equitable relief from Defendants, including, without limitation, injunctive relief and constructive trust, restitution, and equitable tracing (as available under applicable law).

11.   ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiffs bring this action as a class action under FED. R. CIV. P. 23 on behalf of all participants and beneficiaries of the Plan whose Plan accounts were invested in Fifth Third Stock during the Class Period.

12.   In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are made by necessity upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate,

amend this Complaint or, if required, will seek leave to amend to add additional facts that further support Plaintiffs' claims.

## II.       CLASS ACTION ALLEGATIONS

13.       ***Class Definition***.  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following class of persons similarly situated (the "Class"):

14.       All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between July 19, 2007 through the present, and whose accounts included investments in Fifth Third Stock.

15.       ***Class Period***.  The fiduciaries of the Plan knew or should have known at least by July 19, 2007, that the Company's material weaknesses were so pervasive that Fifth Third Stock could no longer be offered as a prudent investment for the retirement Plan.

16.       ***Numerosity***. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to the Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe, based on the Plan's Form 5500 for Plan year 2007, that there are over 26,837 participants or beneficiaries in the Plan.

17.       ***Commonality***.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;
- whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

- whether Defendants violated ERISA; and
- whether the Plan has suffered losses and, if so, the proper measure of damages.

18. *Typicality*. Plaintiffs' claims are typical of the claims of the members of the Class. Because Plaintiffs assert derivative claims on behalf of the Plan pursuant to ERISA § 502(a), Plaintiffs' claims are necessarily typical – indeed, identical – to the derivative claims of any Class member.

19. *Adequacy*. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

20. *Rule 23(b)(1)(B) Requirements*. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

21. *Other Rule 23(b) Requirements*. Class action status is also warranted under the other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (3) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

22.    ***In the alternative, Plaintiffs seek appropriate relief under*** ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).  This section of ERISA states that "[a] civil action may be brought —" "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title[.]"   ERISA Section 409(a), 29 U.S.C. § 1109(a), sets forth that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable ***to make good to such plan any losses to the plan resulting from each such breach***, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by then fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added).   Since the statute does not distinguish in any way among the status or standing of the Secretary of Labor, a plan fiduciary or a plan participant, the statute provides no basis upon which to claim that a participant stands in procedural shoes that are different from either the Secretary or a fiduciary.

### III.    <u>JURISDICTION AND VENUE</u>

23.    ***Subject Matter Jurisdiction***.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

24.    ***Personal Jurisdiction***.   ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All Defendants are either residents of the United States or subject to service in the United States.  Therefore, this Court has personal jurisdiction over them.  This Court also has personal jurisdiction over Defendants pursuant to FED. R. CIV. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of Ohio.

25.    *Venue*.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Fifth Third has its principal place of business in this district.

## IV.    PARTIES

### A.    Plaintiffs

26.    Plaintiff John Dudenhoeffer is a resident of Collier County, Florida.  He worked for Fifth Third for several years and left the Company in early 2008.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Fifth Third Stock in the Plan during the Class Period.

27.    Plaintiff Alireza Partovipanah is a resident of Volusia County, Florida.  He worked for Fifth Third for several years and left the Company in February 2008.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Fifth Third Stock in the Plan during the Class Period.

### B.    Defendants

#### 1.    Fifth Third

28.    *Defendant Fifth Third*.  Fifth Third is an Ohio corporation with its principal place of business at 38 Fountain Square Plaza, Cincinnati, Ohio 45263.  Fifth Third is a diversified financial services company.  As of March 31, 2008, Fifth Third operated 16 affiliates with 1,311 full-service Banking Centers.  Fifth Third reports on five business segments: (i) Commercial Banking; (ii) Branch Banking; (iii) Consumer Lending; (iv) Fifth Third Processing Solutions (FTPS); and (v) Investment Advisors.

29.     At all relevant times during the Class Period, Fifth Third had and has the power to remove the Trustee of the Plan.  *See* The Fifth Third Profit Sharing Trust Agreement (as amended and restated) (the "Trust Agreement"), Article 6, § 6.1 at FTB000252 ("A Trustee may be removed by the Employer at any time by notice in writing to the Trustee").  A true and correct copy of the Trust Agreement is attached hereto and incorporated herein as Exhibit C.

30.     The Trust Agreement may also be amended by the Company or the Director of the Legal/Human Resources of the Company.  *See* Trust Agreement, Article 7, § 7.1(b) at FTB000253 ("Any amendment of this Trust Agreement on behalf of the Employer shall be by action of the Fifth Third Bank Pension and Profit Sharing Committee or by the Director of Legal/Human Resources of the Bank").

31.     *Defendant Kevin T. Kabat ("Kabat")* was, at all relevant times, Chief Executive Officer ("CEO") and President of Fifth Third.  During the Class Period, Defendant Kabat was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or he exercised authority or control with respect to the management of the Plan's assets.

## 2.     <u>The Fifth Third Bank Pension, Profit Sharing and Medical Plan Committee</u>

32.     *Defendant The Fifth Third Bank Pension, Profit Sharing and Medical Plan Committee (the "Committee")* was, at all relevant times, the administrator of the Plan.  *See* 2007 SPD at FTB000257; 2008 SPD at FTB000501; *see also* Organization and Authority of Fifth Third Bank Pension, Profit Sharing and Medical Plan Committee Recitals ("Fifth Third Recitals") at FTB000550 ("The Committee shall act as the 'plan administrator' as defined in the

Employee Retirement Income Security Act of 1974, as amended ('ERISA'), for all Applicable

Plans").  A true and correct copy of the Fifth Third Recitals is attached hereto and incorporated

herein as Exhibit D.

33.     Pursuant to the Fifth Third Recitals, the Committee was allocated the following

power and authority:

> 2.3     The Committee shall have the power and authority in its
> sole, absolute and uncontrolled discretion to:
>
> (a)     interpret plan provisions and to respond to questions
> concerning plan administration.
>
> (b)     adopt and change rules for the administration and
> operation of the plans.
>
> (c)     determine who is a participant.
>
> (d)     determine the rights or benefits (if any) of any
> individual under the plans.
>
> (e)     determine when, to whom, and in what form
> distributions are to be made.
>
> (f)     exercise such power and authority with regard to
> any fund or trust fund as may be necessary or
> appropriate in the administration of the plans.
>
> Benefits under an Applicable Plan will be paid only if the
> Committee, or its delegate, decides in its discretion that the
> applicant is entitled to them.
>
> *       *       *
>
> 2.9     The Committee shall have the authority to terminate any
> Applicable Plan.

*See* Fifth Third Recitals at FTB000550-000551.

34.     During the Class Period, the Committee was comprised of the following

Company employees:

> (a)     **Defendant Paul L. Reynolds ("Reynolds")** was, at all relevant times,
>
> Chairman of the Committee (*see* Minutes of the Committee Notes, dated
>
> Feb. 26, 2008 at FTB000639) and Director of Legal/Human Resources;
>
> Defendant Reynolds also signed The Fifth Third Bancorp Master Profit

Sharing Plan, as amended and restated effective as of December 31, 2000 ("Plan Document") at FTB000073 and signed the Trust Agreement (*see* Trust Agreement at FTB000254).  A true and correct copy of the Plan Document is attached hereto and incorporated herein as Exhibit E.  During the Class Period, defendant Reynolds was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or he exercised authority or control with respect to the management of the Plan's assets;

(b)     ***Defendant Nancy Phillips ("Phillips")*** has served as the Company's Executive Vice President and Chief Human Resources Officer since April 2008.  During the Class Period, defendant Phillips was a member of the Committee.  Pursuant to the Minutes of the Committee Notes, dated Aug. 26, 2008, defendant Reynolds proposed that defendant Phillips serve as the Chairman of the Committee and the Committee unanimously approved (*see* Minutes of the Committee Notes, dated Aug. 26, 2008 at FTB000761).  During the Class Period, defendant Phillips was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or

discretionary responsibility in the administration of the Plan, and/or she exercised authority or control with respect to the management of the Plan's assets;

(c) **Defendant Greg D. Carmichael ("Carmichael")** was, at all relevant times, Executive Vice President and Chief Operating Officer of the Company. During the Class Period, defendant Carmichael was a member of the Committee and a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or he exercised authority or control with respect to the management of the Plan's assets;

(d) **Defendant Robert Sullivan ("Sullivan")** was, at all relevant times, Senior Executive Vice President of the Company. During the Class Period, defendant Sullivan was a member of the Committee and a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or he exercised authority or control with respect to the management of the Plan's assets; and

(e) **_Defendant Mary Tuuk ("Tuuk")_** was, at all relevant times, Executive Vice President and Chief Risk Officer of the Company. During the Class Period, defendant Tuuk was a member of the Committee and a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and/or she exercised authority or control with respect to the management of the Plan's assets

35. Defendants Reynolds, Phillips, Carmichael, Sullivan and Tuuk are herein referred to as the "Committee Defendants."

**3. Additional "John Doe" Defendants**

36. Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including Company officers, directors and employees who are or were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period. The identities of the John Doe Defendants are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to join them to the instant action under their true names.

**V. THE PLAN**

37. The Plan, sponsored by Fifth Third, is a defined contribution plan. The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff.

Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

38.     The Plan is a voluntary contribution plan whereby participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to participants' individual accounts.

39.     As of December 31, 2007, Plan participants could direct their accounts to be invested in Fifth Third Stock, two collective funds or 17 mutual funds offered by the Plan as investment options.  *See* Form 11-K, dated June 27, 2008 ("2008 Form 11-K") at 4.

40.     The Plan is a retirement plan.  *See* 2007 SPD at FTB000274 and 2008 SPD at FTB000518 ("The Plan is for your retirement"); *see also* Plan Document, Article 1, § 1.2 ("The purposes of the Plan are to provide retirement and other benefits for Participants and their respective beneficiaries").

41.     In the Company's 2008 Form 11-K, the Plan is described as the following:

> ***General*** – The Plan is a defined contribution profit sharing plan, with a 401(k) feature, with separate accounts maintained for each participant.  Each employee of a participating Fifth Third Bancorp ("Bancorp") subsidiary, if employed before November 1, 1996, automatically became a participant on the first payroll date after becoming an employee.  With regard to the profit sharing feature, effective January 1, 2004, employees are eligible immediately upon hire.  For the 401(k) feature, employees are eligible to participate after 30 days of service. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").  The Bancorp is the Plan Sponsor.  The original Plan became effective December 31, 1954, and was last amended on November 8, 2007.

42.     Fifth Third Bank serves as the trustee of the Plan.  *See* 2008 Form 11-K at 4. However, pursuant to the Plan Document, the Plan is administered by the Committee.  *See* Plan Document, Article 2, § 2.5 at FTB000005 ("'Administrator' or 'Plan Administrator' means the

Fifth Third Bank Pension and Profit Sharing Committee.  Members of said Committee shall be appointed by, and serve at the pleasure of, the President and Chief Executive Officer of Fifth Third Bank").

43.     Pursuant to the 2008 Form 11-K:

> The Plan permits voluntary contributions from participants up to 100% of their compensation.  Such contributions are credited directly to the participants' accounts and are fully vested. Contributions may be allocated to the available investment options at the discretion of the participant.  Gains and losses under the Plan are valued on a daily basis and allocated to participant accounts based on account balances

44.     Fifth Third employees are eligible to participate in the Plan after they have completed thirty (30) days of service.  Fifth Third matches 100% of the first 4% of the participants' compensation contributed on a pre-tax basis.  A three-year cliff vesting schedule was added to the Plan as of January 1, 2004, so that after three years of service, a participant is 100% vested in the Company matching contributions; anything less than three years of service, a participant is 0% vested.  Current service credit as of January 1, 2004, was grandfathered. Company matching contributions are initially invested in the Fifth Third Stock Fund. Subsequent to the initial investment, matching contributions may be moved to the other investment options.  *See* 2008 Form 11-K at 5; *see also* 2007 SPD at FTB000262 and 2008 SPD at FTB000506; 2007 SPD at FTB000270 and 2008 SPD at FTB00514 ("Employer matching contributions will be made initially into the Fifth Third Stock Fund"); Trust Agreement, § 3.4(b) at FTB00249 ("**Employer Matching Account**.  Subject to the diversification rights and other relevant provisions of the Plan, the Employer Matching Accounts under the Plan shall be invested in the Fifth Third Stock Fund") (emphasis in original).

45. As of December 31, 2007 and 2006, the Plan held 4,588,460 and 4,572,430 shares of Fifth Third Stock, respectively, with fair values of $117,551,104 and $188,439,816, respectively. *See* 2008 Form 11-K at 9.

46. The Plan Document does not mandate that Fifth Third Stock Fund invest solely in Fifth Third Stock. Pursuant to the Plan Document, the Fifth Third Stock Fund "may also be invested in short-term liquid investments to the extent the Administrator or Trustee determines desirable to accommodate the expected short-run liquidity needs of the Plan or Fund." *See* Plan Document, Article 7, § 7.4 at FTB000038; *see also* Trust Agreement, § 3.4(a)(1) at FTB000248-249 ("The Fifth Third Stock Fund shall be invested primarily in shares of common stock of Fifth Third Bancorp. The Fund *may also be invested in short-term liquid investments* to the extent the Administrator or Trustee determines desirable to accommodate the expected short-run liquidity needs of the Plan or Fund. The Trustee shall have no discretionary authority to sell Fifth Third Bancorp shares or to refrain from acquiring additional Fifth Third Bancorp shares with funds not held for short-run liquidity needs. In the event of a merger or other corporate transaction, the Fund may hold whatever assets that may be received") (emphasis added).

47. Furthermore, the Plan does not limit the ability of the Plan fiduciaries, including the Plan administrator, to remove the Fifth Third Stock Fund, or divest assets invested in the Fifth Third Stock Fund, as prudence dictates. *See* Trust Agreement, § 3.3(a) at FTB000248 ("The Administrator shall have the duty of monitoring such investment funds to determine the continued prudence of offering such funds; and the Administrator shall change the investment funds if and when it deems it prudent to do so").

48. Pursuant to the Fifth Third Recitals, "[T]he Committee shall have the power and authority in its sole, absolute and uncontrolled discretion to: . . . exercise such power and

authority with regard to any fund or trust fund as may be necessary or appropriate in the administration of the plans." *See* Fifth Third Recitals § 2.3(f), at FTB000550-551.

49.     The Plan incorporates by reference the Company's SEC filings.  For example, The Fifth Third Bancorp Master Profit Sharing Plan Prospectus (the "Prospectus") states in relevant part:

> The SEC allows us to incorporate by reference into this prospectus the information we file with it, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and information that we subsequently file with the SEC will automatically update and supersede information in this prospectus and in our other filings with the SEC.  In other words, in case of a conflict or inconsistency between information contained in this prospectus and information incorporated by reference into this prospectus, you should rely on the information that was filed later.
>
> We incorporate by reference the documents listed below, which we have already filed with the SEC, and any documents we file with the SEC in the future under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 (other than information in such future filings deemed not to have been filed), until we sell all the securities offered by this prospectus:
>
> *   Annual Report on Form 10-K for the year ended December 31, 2007, as amended;
>
> *   Quarterly Reports on Form 10-Q for the quarters ended March 31, 2008 and June 30, 2008;
>
> *   Current Reports on Form 8-K filed on January 14, 2008, February 25, 2008, February 28, 2008, April 23, 2008, April 24, 2008, May 2, 2008, May 5, 2008, May 6, 2008, June 6, 2008, June 18, 2008, June 24, 2008 and June 25, 2008; and
>
> *   The description of our common stock contained in a registration statement filed under the Securities Exchange Act of 1934, including any amendment or report filed for the purpose of updating such description.

Prospectus at FTB000546-000547.  A true and correct copy of the Prospectus is attached hereto and incorporated herein as Exhibit F.

50.     During the Class Period, a significant amount of the Plan's assets were invested in Fifth Third Stock.  As of December 31, 2007, the Plan held approximately 4,588,460 units of Fifth Third Stock, valued at its market price of over $117,551,104.  *See* 2008 Form 11-K at 9. As of December 31, 2008, the amount of Fifth Third Stock in the Plan had dwindled to $67,600,661 even though units of Fifth Third Stock had increased to 8,176,422.  *See* Form 11-K, Ex. 99, filed June 16, 2009 ("2009 Form 11-K").  Following revelations that Defendants made misleading and inaccurate disclosures or failed to disclose that: (a) First Third operating expenses were rapidly increasing; (b) Fifth Third was undergoing higher loan losses due to its weakening credit quality; (c) Fifth Third was in need of a cash infusion to offset the undisclosed negative trends in loan losses; (d) Fifth Third's Non-Performing Assets were dangerously increasing; and (e) Fifth Third's Tier 1 capital base had declined precipitously and required a major infusion of capital, the price of Fifth Third Stock decreased dramatically.  As of September 18, 2009, Fifth Third Stock traded at approximately $10.24 per share, representing a decline of over 74% since the beginning of the Class Period.  As a result, the Plan incurred substantial losses due to its investment in Fifth Third Stock.

51.     Despite the Plan's substantial investment in Fifth Third Stock, Defendants failed to protect the Plan and its participants and beneficiaries from the risks of the Company's reckless and improper conduct.  Defendants continued to hold the Plan's shares of Fifth Third Stock and compounded the problem (and the losses) by purchasing additional shares during the Class Period.  Plaintiffs believe losses to the Plan are in the tens of millions of dollars.

## VI.    DEFENDANTS' FIDUCIARY STATUS

### A.    The Nature of Fiduciary Status

52.    *Named Fiduciaries*. ERISA requires every plan to have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan document is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

53.    *De Facto Fiduciaries*. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*

54.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the participants in the manner and to the extent set forth in the Plan's documents, under ERISA, and through their conduct.

55.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

56. Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and the claims against each Defendant are based on such specific discretion and authority.

57. Instead of delegating all fiduciary responsibility for the Plan to external service providers, Fifth Third chose to delegate its responsibility regarding the administration of the Plan to the Committee. *See* Plan Document, Article 2, § 2.5 at FTB000005. Fifth Third chose to assign the appointment and removal of fiduciaries to the President of the Company (*see* Fifth Third Recitals at FTB000549), who, in turn, selected the members of the Committee. *See id.*

58. ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions. ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3). However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.** **Fifth Third's Fiduciary Status**

59. On information and belief, in order to comply with ERISA, the Company exercised responsibility through the Committee for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA. *See, e.g.*, ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description). In this regard,

the Company and the Committee disseminated the Plan's documents and related materials, which incorporated by reference, among other things, Fifth Third's inaccurate SEC filings, thus converting such materials into fiduciary communications.

60.     On information and belief, the Company is also charged with the appointment, monitoring, and removal of the Trustee and execution of the Trust documents with the Trustee to provide for the investment, management, and control of the assets of the Plan.  *See* Trust Agreement, Article 6, § 6.1 at FTB000252.

61.     Moreover, on information and belief, Fifth Third exercised control over the activities of its employees who performed fiduciary functions with respect to the Plan, including the Committee.  In particular, Fifth Third through the CEO and President had the authority and discretion to hire, appoint, monitor, and remove the members of the Committee, as well as other officers and employees appointed by Fifth Third to perform Plan-related fiduciary functions in the course and scope of their employment.  Fifth Third had, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities. Additionally, by failing to properly discharge their fiduciary duties under ERISA, the officer and employee fiduciaries breached duties they owed to the Plan's participants and their beneficiaries. Accordingly, the actions of the Plan's Officer and other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

62.     Finally, under basic tenets of corporate law, Fifth Third is imputed with the knowledge its officers and employees (including other Defendants) had regarding the misconduct alleged herein, even if such knowledge is not communicated to Fifth Third.

63.     Consequently, in light of the foregoing duties, responsibilities, and actions, Fifth Third was both a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. §

1102(a)(1), and a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because it exercised discretionary authority or discretionary control over the management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plan.

**C.    Defendant Kabat's Fiduciary Status**

64.    The Plan documents provide that the President and CEO of the Company has the power to appoint the Committee members. *See* Plan Document, Article 2, § 2.5 at FTB000005 ("Members of said Committee shall be appointed by, and serve at the pleasure of, the President and Chief Executive Officer of Fifth Third Bank"); *see also* Fifth Third Recitals at FTB000549. Thus, according to DOL regulations, the President and CEO exercises a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).  Further, the Plan also provides the President with the power to augment the Committee's powers and responsibilities. *See also id.* at FTB000551 ("The Committee shall have such additional powers and responsibilities as the President may determine from time to time").  Moreover, if the Committee is unable to resolve an issue, the President has the authority to do so.  *Id.* at FTB000552 ("Any question that the Committee may not be able to resolve as to its authority, shall be referred to the President for determination").

65.    In light of the foregoing duties and responsibilities, defendant Kabat is a *de facto* fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because he exercises discretionary authority or discretionary control over the management of the Plan, exercises authority or control over the management or disposition of the Plan's assets, and/or has discretionary authority over or discretionary responsibility for the administration of the Plan.

D.     **The Committee Defendants' Fiduciary Status**

66.     The Committee was the Plan administrator during the Class Period.

67.     During the Class Period, the Company also relied on the Committee Defendants to carry out its fiduciary responsibilities under the Plan and ERISA.  As a result, the Committee Defendants are both named and functional fiduciaries under ERISA.

68.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because they exercised discretionary authority or discretionary control over the management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plan.

## VII.     FACTS BEARING ON FIDUCIARY BREACH

69.     Fifth Third operates as a diversified financial services holding company. The Company's Consumer Lending segment is involved in mortgage and home equity lending activities, such as origination, retention, and servicing of mortgage and home equity loans; and other indirect lending activities, which include loans to consumers through mortgage brokers, automobile dealers, and federal and private student education loans. The Company's Commercial Banking segment offers banking, cash management, and financial services; traditional lending and depository products and services; other services, including foreign exchange and international trade finance, derivatives and capital markets services, asset-based lending, real estate finance, public finance, commercial leasing, and syndicated finance for business, government, and professional customers.  The Company's Branch Banking segment

provides a range of deposit and loan, and lease products to individuals and corporations. Its products include checking and savings accounts, home equity loans and lines of credit, and credit cards and loans for automobile and personal financing needs.  The Company's Investment Advisors segment offers a range of investment alternatives for individuals, companies, and not-for-profit organizations. This segment also offers investment, trust, asset management, retirement planning, and custody services, as well as retail brokerage services to individual clients and broker dealer services to the institutional marketplace.  The Fifth Third Processing Solutions segment offers electronic funds transfer, debit, credit, and merchant transaction processing services; and data processing services.

70.     As of March 31, 2009, Fifth Third operated 1,311 full-service banking centers, including 95 Bank Mart locations and 2,354 ATMs in the Midwestern and Southeastern regions of the United States.

71.     Throughout the Class Period, Defendants repeatedly failed to take any steps to protect the interests of the Plan and of the Plan participants and beneficiaries.  Although Defendants knew or should have known that Fifth Third Stock was both imprudent and artificially inflated because of the Company's serious mismanagement, improper business practices, and exposure to the severe problems in the mortgage and credit markets, Defendants did nothing to protect the Plan's substantial investment in Fifth Third Stock.

A.     **The Rise and Risk of Subprime Mortgage Lending**.

72.     The term "subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."   Sandra F.

Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd., *Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services,* Mar. 27, 2007, http://www.federalreserve.gov/newsevents/testimony/Braunstein20070327a.htm.

73.     Originating subprime mortgages had become increasingly popular in recent years – climbing from $120 billion in 2001 to $625 billion in 2005.  Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount,* Wall St. J., Dec. 5, 2006, at A1.

74.     In order to take advantage of this new market, some lenders, such as Fifth Third, began weakening their underwriting standards.  For example, lenders lowered the minimum credit score borrowers needed to qualify for certain loans, allowed borrowers to finance a greater percentage of their home's value, and, in some cases, allowed borrowers to carry a higher debt load (*e.g.*, "no money down").  *See* Ruth Simon*, Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1; *see also* Noelle Knox, *43% of First-time Home Buyers Put No Money Down,* USA Today, Jan. 18, 2006, at A1.

75.     In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers.  Typical subprime mortgages included:

(1)     interest-only mortgages that allowed borrowers to make interest only payments for a period of years before the payments significantly increased when the principal was added;

(2)     pick-a-payment loans, where borrowers chose their monthly payment (full payment, interest-only, or a minimum payment that might have been lower than the payment required to reduce the balance of the loan); and

(3)     adjustable rate loans that were initially fixed but then converted to variable rates, which oftentimes were highly unfavorable.

Sandra Block, *"Pick-a-Payment" Mortgage Risks are High*, <u>USA Today</u>, July 18, 2005, at B3; *see also* Ruth Simon, *New Type of Mortgage Surges in Popularity – Fixed-Rate Interest-Only Loans Offer Lower Initial Payments but Delay Debt Reduction*, <u>Wall St. J.</u>, Apr. 19, 2006, at D1.

76.     These novel terms, combined with lowered lending standards, led to high rates of borrower defaults.

77.     Consequently, in late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices had increased "risks for borrowers and lenders in the overheated housing markets."  Simon, *Mortgage Lenders Loosen Standards*, *supra*.

78.     Trouble in the housing market emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes, which caused the interest rates on variable rate loans, including mortgage loans, to rise.  In response, "bank regulators issued their first-ever guidelines for credit-risk management for home-equity lending" in May 2005. *Id*.

79.     However, most subprime lenders failed to heed these and other warnings. "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards.  Many lenders kept introductory 'teaser' rates low even after short-term interest rates began rising in June 2005." Simon & Hagerty, *supra*.  Subprime borrowers, in particular, had difficulty meeting their monthly payment obligations after their introductory "teaser" rate expired.  In addition, because housing prices were falling, borrowers could not readily re-sell their property for a profit when they could not pay their increased monthly payments, causing mortgage defaults to increase significantly.

80. By the end of 2005, foreclosures and delinquency rates had substantially risen. Simon & Hagerty, *supra*. As of October 2005, the delinquency rate recorded on new subprime loans had doubled from a year earlier. *Id.*

81. Nonetheless, subprime mortgage exposure grew even riskier in 2006 as lenders originated a large number of no-documentation and low-documentation loans, also known as "liar loans." This practice constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001. Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007, at 1. In April 2006, mortgage industry research revealed that 90% of borrowers had overstated their incomes by 5% or more and had inflated their incomes by more than half in 60% of these cases. *Id.*

82. Additionally, piggyback loans, which combined a mortgage with a home-equity loan or line of credit and allowed borrowers to finance more than 80% of their home's value without paying for private mortgage insurance, became increasingly popular, constituting approximately half of all subprime loans in 2006. *Id.* On average, borrowers financed 82% of the underlying value of their property, up 48% from 2000. *See id*.; James R. Hagerty & Ruth Simon, *Home Lenders Pare Risky Loans – More Defaults Prompt Cut in "Piggyback" Mortgages; Housing Market May Suffer*, Wall St. J., Feb. 14, 2007, at A3.

**B.    Published Warnings Place Plan Fiduciaries On
        Notice Of Need To Investigate Risks Of Subprime Exposure**

83. On July 26, 2005, the Wall Street Journal warned that "[m]ortgage lenders are continuing to loosen their standards, despite growing fears that relaxed lending practices could increase risks for borrowers and lenders in overheated housing markets." Simon, *Mortgage Lenders Loosen Standards, supra*.

84.     A little over a year later, <u>Reuters</u> reported that "rising delinquencies and forecasts of a deepening deterioration in housing have prompted big investors, including hedge funds, to bet against subprime-related securities since late 2005."  Al Yoon, *"Irrational" Mortgage Bond Prices Polarize Market*, <u>Reuters</u>, Sept. 25, 2006.

85.     In response to the increasing risks inherent in subprime lending, "the Federal Reserve and the other banking agencies issued guidance on nontraditional mortgage products" on September 29, 2006.  Testimony of Sandra L. Thompson, *supra*.  The "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a warning to the marketplace that bank regulators were concerned about the lessened underwriting standards and generally lax risk management practices of subprime lenders.  *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* Sept. 29, 2006, <u>http://www.federalreserve.gov/boarddocs/srletters/2006/ SR0615a2.pdf</u>.

86.     After experiencing a sharp increase in defaults from new borrowers, Ownit Mortgage Solutions, Inc. closed its doors in early December 2006 and filed for Chapter 11 bankruptcy just a few weeks later.  E. Scott Reckard, *Demise of Ownit Mortgage Hits Home*, <u>L.A. Times</u>, Jan. 3, 2007, at C1.

87.     The <u>Wall Street Journal</u> reported that in 2006 alone, roughly 80,000 subprime borrowers had fallen into delinquency, many shortly after loan origination.  Simon & Hagerty, *supra*.

88.     On December 20, 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market.  Ron Nixon, *Study Predicts Foreclosure for 1 In 5 Subprime Loans*, <u>N.Y. Times</u>, Dec. 20, 2006, at C1.  Shortly

thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and Federal Deposit Insurance Corporation ("FDIC"), and resulting in several bankruptcy filings.  *Id.*

89.     On January 3, 2007, <u>Consumer Affairs</u> published an article that warned that "as the housing market slows to a crawl, many subprime lenders are collapsing faster than homes made of substandard materials, and the signs point to even more pain in the housing market as a result."  Martin H. Bosworth, *Subprime Lender Implosion: Bad Omen For Housing*, <u>Consumer Affairs</u>, Jan. 3, 2007, <u>http://www.consumeraffairs.com/news04/2007/01/mln_subprime.html</u>.

90.     Indeed, by early 2007, the collapse of the subprime lending industry was well underway.  "Across the industry, 2.6 percent of the subprime loans securitized in the second quarter of 2006 had been foreclosed on or repossessed within six months.  That is up from 1 percent for loans securitized in the second quarter of 2005," as reflected in the chart below:



Vikas Bajaj and Christine Haugheny, *Tremors at the Door - More People With Weak Credit Are Defaulting on Mortgages*, <u>N.Y. Times</u>, Jan. 26, 2007, at C2.

91. On March 11, 2007, the <u>New York Times</u> reported that more than two dozen subprime mortgage lenders had failed or filed for bankruptcy. Morgenson, *Crisis Looms In Market for Mortgages*, *supra*.

92. Two weeks later, the <u>Wall Street Journal</u> reported that New Century Financial Corp. ("New Century"), the largest U.S. subprime lender, was on the "brink of bankruptcy" because it could not pay back loans it took from Wall Street banks. Gregory Zuckerman, *How Street Hit Lender – 'Subprime' King New Century Was Down but Not Quite Out; Then, Banks Shut Cash Spigot*, <u>Wall St. J.</u>, Mar. 29, 2007, at C1.

93. Four days later, New Century filed for Chapter 11 bankruptcy. Julie Creswell and Vikas Bajaj, *Home Lender is Seeking Bankruptcy*, <u>N.Y. Times</u>, Apr. 3, 2007, at C1.

94. In total, from the end of 2006 through July 1, 2007, 15 mortgage companies had gone bankrupt and close to 50 more had suspended loans or closed entirely. Rick Green, *Lehman Shuts Unit; Toll of Lenders Tops 100: Subprime Scorecard*, Bloomberg.com, Aug. 23, 2007, [http://www.bloomberg.com/apps/news?pid=20601206&sid=aQBUrPcefMtc&refer](http://www.bloomberg.com/apps/news?pid=20601206&sid=aQBUrPcefMtc&refer)=<u>realestate</u>.

95. Despite these warnings of the dangers of subprime lending, Defendants failed to investigate the propriety of maintaining the Fifth Third Stock Fund as an investment option for the Plan.

**C.      Fifth Third Stock Was An Imprudent Investment For The Plan During The Class Period Because Of Serious Mismanagement, The Precipitous Decline Of The Company's Stock Price, And The Company's Rapidly Deteriorating Financial Condition**

96. During the Class Period, Fifth Third was plagued by severe structural problems—including overexposure to subprime and Alt-A mortgages, failures in risk management, and a lack of sound leadership. These problems made it imprudent for the Plan's fiduciaries—who

were also key leaders of the Company—to maintain the Plan's massive investment in Fifth Third Stock.  Fifth Third Stock posed an unduly large risk of significant loss and this risk is not one that could be prudently borne by an employee retirement plan.

97.     These risks, which Defendants knew or should have known existed, were exacerbated by incomplete and inaccurate statements issued by Fifth Third.

98.     Fifth Third's faulty business model and failures in risk management, coupled with incomplete and inaccurate statements by Fifth Third executives, caused the price of Fifth Third Stock to be artificially inflated.

99.     The risk of significant loss to the Plan was exacerbated by the fact that Fifth Third Stock constituted a significant amount of the Plan's total assets.  Despite the profound risk the Company faced due to its exposure to the subprime mortgage crisis as well as the Company's corporate mismanagement, Defendants failed to undertake any meaningful action to protect the Plan from the massive losses that have been caused by the Plan's holding hundreds of millions of dollars of Fifth Third Stock while exigent circumstances beset Fifth Third during the Class Period.  For example, Defendants continued to allow the Plan's investment in Fifth Third Stock even during the time that the stock price was declining in value as a result of collapse of the housing market.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan's assets were decimated.

100.    During the Class Period, Fifth Third Stock was an imprudent investment for the Plan participants' retirement savings.  The Company suffered from business and accounting mismanagement related to its high-risk subprime exposure, which was not disclosed to the public even as it created dire financial circumstances and exposed the Plan to huge losses.

101. Moreover, this grave mismanagement and corresponding deterioration in financial condition contributed to the artificial inflation of the value of the Fifth Third Stock, further increasing the risk of loss. As the DOL, the agency charged with responsibility for enforcing ERISA, has stated, it is never prudent for a retirement plan fiduciary to purchase company stock that he knows or should know is artificially inflated. Brief of the Secretary of Labor as Amicus Curie Supporting Appellants and Requesting Reversal at 15-16, *In re Calpine Corp. ERISA Litig.*, No. 06-15013 (9th Cir. Nov. 16, 2006).

102. A fiduciary's duty of prudence under an ERISA-governed retirement plan, requires that he or she may not ignore circumstances, such as those here, that increase the risk of loss to participants and beneficiaries to an imprudent level.

103. A variety of circumstances contributed to the unacceptable level of risk borne by Plan participants as a result of the Plan's investment in Fifth Third Stock, including, but not limited to, the Company's:

    (1)    overexposure to loans tied to the declining housing and construction market;

    (2)    exposure to subprime loans through, *inter alia*, its ill-timed acquisition of First Charter Corp. which was involved in subprime residential lending;

    (3)    failure to implement and maintain sufficient risk management control processes;

    (4)    failure to properly reserve for losses;

    (5)    failure to properly account for and disclose its exposure to losses tied to its business operations in the subprime market;

    (6)    artificial inflation of Fifth Third Stock caused by these circumstances; and

    (7)    dire financial circumstances created by Fifth Third's subprime exposure and improper business practices.

1.      **Fifth Third No Longer Utilized Conservative Lending Practices**

104.    Despite the published warnings and other negative indicators, such as rising interest rates and a cooling housing market, Fifth Third not only failed to safeguard its own financial condition from the imminent decline in mortgage and construction financing, but also plunged toward the bottom of the deteriorating market when Fifth Third departed from its historically conservative lending practices and embarked on a Company-wide mission to grow its commercial real estate and consumer lending businesses by offering what amounted to subprime loans.  This departure greatly increased Fifth Third's risk of loss by subjecting the Company to the housing market collapse.

105.    Prior to 2006, Fifth Third had successfully grown its mortgage business but had not expanded into subprime lending.

106.    Beginning in 2006, however, Fifth Third aggressively marketed Alt-A mortgages, 80/20 mortgages, option-ARMs, and high LTV land and construction loans under the guise of brand names such as SimpleFlex, FLEX 53, Quick & Simple, Alt-97, and Loan Prospector. These products all had one thing in common:  they disregarded borrower qualifications, particularly the borrower's income – the primary indicia of ability to repay – and instead looked to the property securing the loan for repayment in the event of a default.  Moreover, by making high LTV loans to marginally qualified borrowers and developers, Defendants were betting the bank on an appreciating real estate market at a time when that market was deteriorating.

107.    Fifth Third routinely issued Alt-A loans to borrowers with credit scores below the FIRC's 660 FICO score-threshold for subprime loans and carried the added risk of undocumented incomes and/or assets; unverified employment, income and/or assets; and total debt-to-income ratios of 50% or greater.

108.     Furthermore, and adding even greater risk, Fifth Third's Alt-A loans were often extended with LTV ratios as high as 100% of the value of the collateral, which greatly increased the risk to Fifth Third because it left no equity to recover in the event of a foreclosure.

109.     This was a business strategy that entailed a high degree of risk and should have been disclosed to Plan participants, but was not.  Ultimately, Defendants' strategy proved toxic when the real estate markets continued to deteriorate at a rapid pace.

110.     As the real estate market slowed in 2006 and 2007, and housing prices stagnated and then fell, the importance of loan quality came to the forefront.  With home prices declining and refinancing increasingly unavailable, borrowers' ability to pay their mortgages became critical to minimize Fifth Third's loss exposure.

111.     During the Class Period, Defendants portrayed Fifth Third to the public and Plan participants as a "prime mortgage originator" that employed stringent risk management practices based on its "core principles" of "conservatism, diversification and monitoring."  Moreover, in making statements concerning "prime" versus "subprime" lending, Defendants concealed from, and/or failed to disclose to, Plan participants the Company's internal working definition of "prime," which was utterly and completely inconsistent with commonly accepted definitions of the term within the banking industry.

112.     In reality, Defendants had engineered the growth of the Company's mortgage lending business through aggressive marketing of Alt-A mortgage products that were characterized by precisely the same risks as subprime lending.

**2.      Defendants Failed to Provide the Plan's Participants, Beneficiaries, and their Co-Fiduciaries with Complete and Accurate Information about the True Risks of Investment in Fifth Third Stock in the Plan**

113.     The Class Period begins on July 19, 2007, when the Company issued a press release and its quarterly financial supplement announcing its earnings for the second quarter of

2007.  *See* Form 8-K Submission to the SEC, filed July 19, 2007.  The Company reported second quarter 2007 earnings of $376 million, or $0.69 per diluted share, compared with $359 million, or $0.65 per diluted share, in the first quarter of 2007 and $382 million, or $0.69 per diluted share, for the same period in 2006.

114.    In the July 19, 2007 press release, the Company downplayed any serious impact from the mortgage/credit crisis.  Defendant Kabat stated, "Second quarter results were strong across most areas of the Company."  The Company boasted of its 6% revenue growth, increase in net interest income and 8% fee growth.  While acknowledging that "credit is a challenge at this point in the cycle," the Company stated that it was actively managing its credit risks and expected any credit deterioration to remain within its expectations.  Defendant Kabat stated, "All told, we were pleased with our results, and remain very focused on executing on our strategic plans and building shareholder value."

115.    On August 16, 2007, Fifth Third announced that it would acquire First Charter Corp., which operated 57 branches in North Carolina and 2 in suburban Atlanta, for $1.1 billion. *See* Form 8-K Submission to the SEC, filed August 16, 2007.  Since 2004, First Charter Corp. had been involved in subprime residential lending.  *See* Fred Tannenbaum, *New World Braves Trends*, American City Business Journals, May 21, 2004, at 1.

116.    On September 11, 2007, Fifth Third made a presentation at the Lehman Brothers Financial Services Conference, wherein the Company focused on its "strong expense management" and "strong underlying performance."  Additionally, Fifth Third touted its residential mortgage portfolio, noting its average LTV, average weighted FICO scores and level of net charge-offs.

117.    On October 19, 2007, Fifth Third issued a press release and its quarterly financial supplement announcing its earnings release for the third quarter of 2007.  *See* Form 8-K Submission to the SEC, filed October, 19, 2007.

118.    The Company reported third quarter 2007 earnings of $376 million, or $0.71 per diluted share, compared with $376 million, or $0.69 per diluted share, in the second quarter of 2007 and $377 million, or $0.68 per diluted share, for the same period in 2006.

119.    The Company again downplayed the impact of the mortgage market crisis upon its financial condition, stating that, despite significant market disruption during the quarter, "t]hird quarter results were solid" and the Company was "spared most of its effects."

120.    Defendant Kabat stated that, while credit continued to be a challenge during the quarter and the Company expected some deterioration in credit trends in the near future, the deterioration would be manageable:  "Overall, we were pleased with our results given the macro environment in this kind of quarter and continue to execute our strategic plans."

121.    The 2007 Third Quarter Earnings Release attached to the October 19, 2007 press release further stated:

> Provision for loan and lease losses totaled $139 million in the third quarter, exceeding net charge-offs of $115 million, compared with $121 million last quarter and $87 million in the same quarter last year.  The allowance for loan and lease losses represented 1.08 percent of total loans and leases outstanding as of quarter end, compared with 1.06 percent last quarter and 1.04 percent in the same quarter last year.

122.    Defendants represented that the Company increased its reserves for loan losses, but did not disclose that Defendants delayed increasing allowances for loan and lease losses to an amount sufficient to cover the Company's risky loan portfolio, which was likely to suffer

increased defaults.  Defendants' reliance on historical loss rates resulted in an insufficient provision in light of the real estate and financial market.

123.    On November 9, 2007, Fifth Third filed its quarterly report on Form 10-Q for the quarter ended September 30, 2007 and made the following disclosures regarding nonperforming assets:

> Commercial nonaccrual credits as a percentage of commercial loans increased since the third quarter of 2006, from .61% to 1.00%.  The majority of the increase continues to be driven by the real estate and construction industries in the Southern Florida, Northeastern Ohio and Eastern Michigan affiliates . . . As of September 30, 2007, the Bancorp has outstanding loans to homebuilders of $1.4 billion, exposure of $2.4 billion and $49 million of nonaccrual credits.

> Consumer nonaccrual credits as a percent of consumer loans increased since the third quarter of 2006, from .22% to .41%.  The increase in consumer nonaccrual credits is primarily attributable to the housing markets in the Michigan and Florida affiliates, the changes in policy for the repossession of automobiles and the restructuring of certain high risk loans.

> *        *        *

> Total nonperforming assets were $706 million at September 30, 2007, compared to $455 million at December 31, 2006 and $411 million at September 30, 2006.  Nonperforming assets as a percentage of total loans, leases and other assets, including other real estate owned increased to .92% as of September 30, 2007 compared to .61% as of December 31, 2006 and .56% as of September 30, 2006.

124.    Defendants accused "the real estate and construction industries in the Southern Florida, Northeastern Ohio and Eastern Michigan affiliates" for being the cause of increased commercial nonperforming assets and blamed increased consumer nonperforming assets "primarily " on "the housing markets in the Michigan and Florida," which concealed and/or failed to disclose the fact that these increased loan defaults were the inevitable consequence of

the Company's abandonment of conservative lending and underwriting standards and its ineffective risk management practices.

125.    Defendants further stated in the Form 10-Q for the Third Quarter 2007 that "[t]he provision for loan and lease losses increased to $139 million in the third quarter of 2007" and that the "$52 million increase is related to loan growth during the past year, increases in delinquencies and increases in severity of loss from the decline in the real estate market."

126.    However, Defendants concealed and/or failed to disclose that they delayed increasing allowances for loan and lease losses to an amount sufficient to cover Fifth Third's risky loan portfolio.  The allowances were inadequate because the credit quality of the loan portfolio was deteriorating as a result of Fifth Third's abandonment of conservative mortgage underwriting practices.

127.    The Defendants further concealed and/or failed to disclose that Fifth Third had grossly deficient underwriting and risk management standards and, since at least the third quarter of 2006, originated extremely risky loans, including land loans with LTVs as high as 90% and Alt-A loans with multiple layered risk factors that were precisely the same risk factors characteristic of subprime loans.

128.    The Third Quarter 2007 10-Q acknowledged that Fifth Third originated Alt-A mortgages, but inaccurately claimed that borrower qualifications for Alt-A loans were comparable to conforming mortgages, and that such loans were primarily originated for sale rather than being held for investment purposes, stating:

> The Bancorp originates certain non-conforming residential mortgage loans known as Alt-A.  Borrower qualifications are comparable to other conforming residential mortgage products and the Bancorp has sold the majority of these loans into the secondary market without recourse.  For the three and nine months ended September 30, 2007, the Bancorp originated $71 million and $644

million of Alt-A loans. During 2007, approximately $150 million of Alt-A loans were moved from held for sale to held for investment, and an impairment charge of approximately $3 million was recognized in the mortgage banking net revenue. As of September 30, 2007, the Bancorp held $163 million of Alt-A loans for investment with approximately $2 million on nonaccrual status. As market conditions for these loans changed throughout 2007, management responded by making adjustments to underwriting standards and, as of September 30, 2007, all Alt-A loans are being underwritten and sold under an agency flow sale agreement.

129.    The Company concealed and/or failed to disclose that it had been originating Alt-A loans where the borrowers did not meet the qualifications of conforming residential mortgages. Rather the Alt-A loans were approved for borrowers with multiple risk factors, including FICO scores below 660, unverified employment, unverified income, and unverified assets. Furthermore, the Alt-A loans were approved at LTV rations as high as 100% through the use of 80/20 products.

130.    Furthermore, the Third Quarter 2007 10-Q represented that Fifth Third's risk management strategy is based on "conservatism, diversification and monitoring," stating:

The objective of the Bancorp's credit risk management strategy is to quantify and manage credit risk on an aggregate portfolio basis, as well as to limit the risk of loss resulting from an individual customer default. The Bancorp's credit risk management strategy is based on three core principles: conservatism, diversification and monitoring. The Bancorp believes that effective credit risk management begins with conservative lending practices. These practices include conservative exposure, counterparty limits and conservative underwriting, documentation and collection standards. The Bancorp's credit risk management strategy also emphasizes diversification on a geographic, industry and customer level, regular credit examinations and monthly management reviews of large credit exposures and credits experiencing deterioration of credit quality. Lending officers with the authority to extend credit are delegated specific authority amounts, the utilization of which is closely monitored. Lending activities are largely centralized, while ERM manages the policy and authority delegation process directly. The Credit Risk Review function, within ERM, provides objective assessments of the quality of

underwriting and documentation, the accuracy of risk grades and the charge-off and reserve analysis process.

131.    Defendants' statements regarding their "conservative lending practices" and "core principles" of "conservatism, diversification and monitoring" concealed and/or failed to disclose that Fifth Third had inadequate controls over its loan origination and underwriting and its loan portfolio was riddled with under-collateralized loans issued to borrowers that lacked sufficient incomes or assets to repay their loans.  Also, contrary to Defendants' representations, the Company had under-reserved for probable loan losses and a substantially greater proportion of its loan portfolio was impaired or at risk for becoming impaired due to the Company's grossly deficient underwriting and risk management policies.

132.    With respect to Fifth Third's capitalization, the Third Quarter 2007 10-Q represented that Fifth Third maintained relatively high levels of capital in order to protect shareholders and that it was well-capitalized, stating:

> The Bancorp maintains a relatively high level of capital as a margin of safety for its depositors and shareholders. At September 30, 2007, shareholders' equity was $9.3 billion, compared to $10.0 billion at December 31, 2006 and September 30, 2006. Average shareholders' equity as a percentage of average assets for the third quarter of 2007 was 9.13% compared to 9.33% in the same quarter last year. Tangible equity as a percent of tangible assets was 6.83% and 7.40% at September 30, 2007 and 2006, respectively. The decline in shareholders' equity and the tangible equity ratio are a result of the $1.1 billion in share repurchases during 2007.

133.    However, the Company failed to disclose that the credit quality of Fifth Third's Tier 1 capital had severely deteriorated due to the poor credit quality of its loan portfolio and failure to set aside adequate reserves for loan losses, thus leaving the Company undercapitalized. The Company also failed to disclose that, as a direct and proximate result of the foregoing, it would be required to raise massive amounts of capital through, among other things, slashing its

annual dividend, selling billions of dollars of dilutive preferred stock, selling assets, and seeking federal bailout funds.

134. The Company concealed and/or failed to disclose its problems stemming from its deterioration in credit quality and the fact that, in reality, it was suffering under the weight of higher loan loss provisions. In truth, Fifth Third was experiencing greater net charge-offs and had failed to sufficiently raise loan loss provisions to an adequate level.

135. On November 14, 2007, Fifth Third presented at the Merrill Lynch 2007 Banking & Financial Services Conference. The Company attempted to focus the attention of investors (including Plan participants) on its expansion in certain markets, including the Southeast and Chicago, and its income diversification and diversified loan portfolio. The Company also boasted that it was experiencing less net charge-offs than its competitors and touted its strong liquidity and capital positions. However, Defendants concealed and/or failed to disclose that the Company was not using prudent lending standards.

136. On November 29, 2007, Fifth Third gave a presentation to analysts at the Fox-Pitt, Kelton Cochran Caronia Waller Financial Services Conference, wherein the Company touted its credit quality and diversified loan portfolio. Again, Defendants concealed and/or failed to disclose the true magnitude of the risk of Fifth Third's consumer loan portfolio because it failed to disclose: (i) the layering of risk factors such as marginal FICO scores and high LTV ratios; (ii) whether the Company required that borrowers obtain private mortgage insurance for high LTV loans; (iii) whether the Company had verified key borrower information such as employment, income, and assets, particularly on risky Alt-A loans, ARMs, high LTV loans, and marginal FICO score borrowers; (iv) the Company relied on a subjective "reasonableness" standard for assessing the veracity of borrowers' reported incomes and assets for no-

documentation loans; (v) Fifth Third had progressively lowered its lending/underwriting standards prior to and during the Class Period; (vi) the Company was routinely making exceptions to its weakened and materially deficient underwriting standards; and (vii) the Company's internal definition of "prime" versus "subprime," which was inconsistent with accepted industry definitions.

137.    On January 22, 2008, as the Company's stock price slid downward, the Company issued its fourth quarter and year-end earnings for 2007.  Fifth Third reported 2007 earnings of $1.1 billion, or $2.03 per diluted share, compared with $1.2 billion, or $2.13 per diluted share in 2006.  Reported fourth quarter 2007 earnings were $38 million, or $0.07 per diluted share, compared with $325 million, or $0.61 per diluted share in the third quarter of 2007 and $66 million, or $0.12 per diluted share, for the same period in 2006.  Further, Fifth Third reported a non-cash estimated charge of $155 million, both pre-tax and after-tax, or $0.29 per share, to lower the current cash surrender value of one of its Bank-Owned Life Insurance ("BOLI") policies.

138.    While acknowledging that the credit markets were under stress, Fifth Third insisted that it was performing well overall.  The Company stated that:

> We have been actively working over the past year to take steps to address areas of concern.  These areas include home equity loans and, more generally, real estate loans, particularly in the upper Midwest and Florida.  As a lending institution, we know we will experience credit cycles and we expect them.  It is our responsibility to ensure that we are prepared for them and that we have the balance sheet strength and earnings power to manage through them.  Fortunately, Fifth Third is well-positioned on both counts, and we intend to continue to focus on executing on our strategic plans and capitalizing on opportunities presented by this environment.

*See* Form 8-K Submission to the SEC, filed January 22, 2008.

139.    However, the Company failed to disclose that non-performing assets were increasing at an alarming rate and, further, that its loan portfolio was in need of a major capital infusion. Moreover, while positive revenue momentum continued, the Company failed to disclose increasing negative trends in loan loss provisions.

140.    On January 30, 2008, Fifth Third gave a presentation at the Citi 2008 Financial Services Conference, wherein Defendants touted the Company's purported ability to "[m]aintain strong tangible capital ratios, absolute and relative to peers," including a Tier 1 capital ratio of 7.71% and Tangible Common Equity of 6.07% as percentage of tangible assets.  Contrary to the statements in the January 30, 2008 presentation, however, the Company did not disclose the full extent of the deterioration of its loan portfolio and did not reflect the rapidly growing number of loans that had become 30 to 89 days delinquent for which Fifth Third did not take additional reserves.  In a declining real estate market, the 30 to 89 day past due loans are considered a lead indicator of and precursor to potential nonperforming loans and charge-offs.  As such, these loans should have been considered impaired and the Company should have taken reserves against such loans, but failed to do so in order to continue to artificially inflate the Company's reported financial results.  As a result of the deterioration of the credit quality of the Company's loan portfolio, a substantial portion of Fifth Third's Tier 1 Capital was impaired, requiring a massive infusion of capital.

141.    On February 22, 2008, Fifth Third filed with the SEC its annual report on Form 10-K, which stated, in relevant part:  "[T]he financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant."  The 2007 10-K reiterated the financial results reported in the January 22, 2008 Earnings Release.  The Defendants' statements in the 2007 10-

K were incomplete and inaccurate because the Company's net income was materially overstated due to Fifth Third's failure to take timely and adequate reserves for loan losses. Throughout the Class Period, Defendants delayed increasing allowances for loan and lease losses in order to preserve the illusion the Fifth Third was profitable and had sufficient earnings to support dividend payments, while remaining well-capitalized.

142.    Additionally, the 2007 10-K claimed that Fifth Third did not have any exposure to subprime mortgages or subprime backed securities, stating:

> The Bancorp maintains a conservative approach to both lending and investing activities as it does not originate or hold subprime loans, nor does it hold collateralized debt obligations ("CDOs") or asset-backed securities backed by subprime loans in its securities portfolio. However, the Bancorp has exposure to the housing markets, which weakened considerably during 2007, particularly in the upper Midwest and Florida. Consequently, net charge-offs as a percent of average loans and leases were 61 basis points ("bp") in 2007 compared to 44 bp in 2006. At December 31, 2007, nonperforming assets as a percent of loans and leases increased to 1.32% from .61% at December 31, 2006.

143.    Defendants' statement that the Company "maintains a conservative approach to both lending and investing activities as it does not originate or hold subprime loans" was incomplete and inaccurate because Fifth Third had been originating subprime loans under the guise of Alt-A lending since mid-2006, and Fifth Third was forced to retain in its held-for-investment portfolio many of the riskiest loans it originated because it was unable to sell them in the secondary market.

144.    The 2007 10-K also claimed that Fifth Third was "well-capitalized," stating:

> The Bancorp's capital ratios exceed the "well-capitalized" guidelines as defined by the Board of Governors of the Federal Reserve System ("FRB"). As of December 31, 2007, the Tier I capital ratio was 7.72% and the total risk based capital ratio was 10.16%. The Bancorp had senior debt ratings of "Aa3" with Moody's, "A+" with Standard & Poor's, "AA-" with Fitch and

"AAL" with DBRS at December 31, 2007, which indicate the Bancorp's strong capacity to meet its financial commitments. The "well-capitalized" capital ratios, along with strong credit ratings, provide the Bancorp with access to the capital markets.

145.     Defendants' statement that Fifth Third was "well-capitalized" was incomplete and inaccurate because the Company's core Tier 1 capital was severely compromised by the poor credit quality of the Company's loan portfolio, which was deteriorating at a more rapid rate than Defendants publicly disclosed.   Further the statement concealed and/or failed to disclose Defendants' failure to timely and adequately set aside loan loss reserves sufficient to compensate for losses that Defendants could reasonably expect based on, among other things, the percentage of loans in the Company's portfolio that were then 30 to 89 days delinquent.

146.     Under the heading "Credit Risk Management," the 2007 10-K reiterated that the Company did not have any subprime exposure, stating:

> If trends in charge-offs, delinquent loans and economic conditions continue to deteriorate in 2008, the Bancorp would expect to record a large allowance for credit losses in accordance with its allowance methodology. Overall, the Bancorp's long history of low exposure limits, lack of exposure to subprime lending businesses, centralized risk management and its diversified portfolio reduces the likelihood of significant unexpected credit losses.

147.     With respect to the Company's methodology for setting reserves for loan losses, the 2007 10-K represented that such reserves were based on "conservative" estimates "based on historical loss rates, current credit grades," and that it reviewed loss rates on a quarterly basis and made adjustments in its reserves accordingly:

> The Bancorp maintains an allowance to absorb probable loan and lease losses inherent in the portfolio. The allowance is maintained at a level the Bancorp considers to be adequate and is based on ongoing quarterly assessments and evaluations of the collectibility and historical loss experience of loans and leases. Credit losses are charged and recoveries are credited to the allowance. Provisions

for loan and lease losses are based on the Bancorp's review of the historical credit loss experience and such factors that, in management's judgment, deserve consideration under existing economic conditions in estimating probable credit losses. In determining the appropriate level of the allowance, the Bancorp estimates losses using a range derived from "base" and "conservative" estimates. The Bancorp's strategy for credit risk management includes a combination of conservative exposure limits significantly below legal lending limits and conservative underwriting, documentation and collections standards. The strategy also emphasizes diversification on a geographic, industry and customer level, regular credit examinations and quarterly management reviews of large credit exposures and loans experiencing deterioration of credit quality.

*          *          *

Historical loss rates for commercial and consumer loans may be adjusted for significant factors that, in management's judgment, are necessary to reflect losses inherent in the portfolio. Factors that management considers in the analysis include the effects of the national and local economies; trends in the nature and volume of delinquencies, charge-offs and nonaccrual loans; changes in mix; credit score migration comparisons; asset quality trends; risk management and loan administration; changes in the internal lending policies and credit standards; collection practices; and examination results from bank regulatory agencies and the Bancorp's internal credit examiners.

The Bancorp's current methodology for determining the allowance for loan and lease losses is based on historical loss rates, current credit grades, specific allocation on impaired commercial credits and other qualitative adjustments. Allowances on individual loans and historical loss rates are reviewed quarterly and adjusted as necessary based on changing borrower and/or collateral conditions and actual collection and charge-off experience. An unallocated allowance is maintained to recognize the imprecision in estimating and measuring loss when evaluating allowances for individual loans or pools of loans.

148.     The 2007 10-K failed to accurately and completely disclose the extent of the

growth in the Company's non-performing assets and that the rapidly deteriorating credit quality

of its loan portfolio was quickly eroding the Company's capital structure, and would require the

Company to raise billions in new capital. Among other things, Defendants failed to take additional reserves for the rapidly growing number of loans that had become 30 to 89 days delinquent, which should have been considered impaired given the downturn in the real estate market.

149. With respect to Alt-A lending, the 2007 10-K acknowledged that Fifth Third had originated Alt-A loans but did not disclose that the borrower qualifications for Alt-A loans were not comparable to conventional, conforming mortgages. Additionally, Defendants represented that Fifth Third sold the majority of its Alt-A loans without recourse, stating:

> The Bancorp originates certain non-conforming residential mortgage loans known as "Alt-A" loans. Borrower qualifications are comparable to other conforming residential mortgage products and the Bancorp has sold, without recourse, the majority of these loans into the secondary market. For the years ended December 31, 2007 and 2006, the Bancorp originated $756 million and $341 million of Alt-A mortgage loans. During 2007, approximately $152 million of Alt-A mortgage loans were moved from held for sale to held for investment, and an impairment charge of approximately $3 million was recognized in mortgage banking net revenue. As of December 31, 2007, the Bancorp held $134 million of Alt-A mortgage loans for investment with approximately $2.5 million in nonaccrual. As market conditions for these loans changed throughout 2007, management responded by making adjustments to underwriting standards and Alt-A loans are being underwritten and sold under an agency flow sale agreement.

150. Defendants' statements in the 2007 10-K regarding the Company's origination of Alt-A loans were incomplete and inaccurate because they continued to blame general market trends for the deterioration in the Company's Alt-A loan portfolio, while concealing and/or failing to disclose that the Company had under-reserved for probable Alt-A loan losses. Contrary to Defendants' representations, Fifth Third lacked adequate controls over its loan origination and underwriting and its Alt-A loan portfolio was riddled with under-collateralized loans issued to borrowers who lacked sufficient incomes or assets to repay their loans. The Company's

representation that the borrower qualifications for Alt-A loans were "comparable to other conforming residential mortgage products" concealed and/or failed to disclose that the Alt-A loans were actually comparable to subprime loans.

151.    On or about March 17, 2008, Moody's Investors lowered its outlook on Fifth Third to negative, predicting that a deterioration of the Company's core profitability was likely to continue.

152.    Despite the fact that they knew or should have known that Fifth Third Stock was an imprudent Plan investment, Defendants took no action whatsoever to protect the Plan's assets from losses.

153.    On April 22, 2008, the Company issued First Quarter 2008 earnings of $292 million, or $0.55 per diluted share, compared with $16 million, or $0.03 per diluted share in the fourth quarter of 2007 and $359 million, or $0.65 per diluted share, for the same period in 2007.

154.    The Company attempted to focus on the positive.  Defendant Kabat stated that Fifth Third had "produced excellent loan and deposit growth that drove impressive performance in net interest income and continued strong fee growth from our businesses."  While acknowledging higher credit costs, primarily reflecting further deterioration of residential real estate, homebuilder and residential development loans, as well as nonperforming asset growth and higher loan losses, the Company stated that it remained "very active in taking steps to address the issues we and the industry are facing, and to work with borrowers to address difficulties they are experiencing."  Fifth Third also reassured investors that:

> though every credit cycle differs, we expect them to occur. We take seriously our responsibility to provide credit to our customers, to lend prudently, and to maintain the capital necessary to manage through these cycles. This is an unusually difficult cycle, but we believe Fifth Third is well-positioned relative to many of its peers. We expect to continue to post strong operating results, to execute

> on our strategic plans, and to capitalize on the opportunities that
> are created by an environment such as this.

*See* Form 8-K Submission to the SEC, filed April 22, 2008.

155.    The Company's Tier 1 capital ratio was in need of support because it had continued to deteriorate, necessitating a major infusion of capital.  However, Fifth Third continued to conceal and/or failed to disclose the truth regarding its financial condition and its exposure to mortgage-related losses.  The Company failed to disclose the true magnitude of its ever-increasing provisions for loan and lease losses.

156.    The deception was successful as the Company's stock price experienced an 8% increase.

157.    Meanwhile, Fifth Third's credit losses were increasing from an unabated trend as the housing market continued to stumble in the Mid-West region and Defendants knew or should have known that its dangerous increase in net charge-offs would continue to climb.

158.    Further, the Company's deteriorating capital base necessitated a sale of non-core businesses to supplement common equity capital.  Fifth Third described these non-core businesses as "several non-strategic businesses that are not significantly synergistic with [Fifth Third's] core financial services businesses."  *See* June 18, 2008 Company Press Release.

159.    On May 2, 2008, Fifth Third announced the resignation of Chief Financial Officer Christopher G. Marshall and stated that Daniel T. Poston, Executive Vice President and Controller of Fifth Third Bancorp, would serve as the Chief Financial Officer of Fifth Third until a permanent successor of Marshal was named.

160.    In mid-May 2008, <u>Bloomberg</u> reported that a sharp decline in a Fifth Third hedge fund investment led to the more than $300 million in charge-offs the bank had taken with respect to its BOLI policies.  While the Company had acknowledged that the charge was caused by

"further deterioration in the values of the underlying investments of the policy," it had failed to disclose that much of the losses came about because of hedge investments within those policies. *Hedge Funds Hurt Fifth Third's Results*, <u>Dayton Business Journal</u>, dated May 20, 2008.

161.    Fifth Third continued to conceal and/or fail to disclose the truth regarding its financial condition.  During a May 2008 UBS Financial Services conference, defendant Kabat told a UBS conference that he was "reasonably confident" that bad loans would "not require significant additional reserves to cover losses."  Laurie Kulowski, *Banks Continue to Stuff Loan Cushions*, <u>TheStreet.com</u>, dated May 22, 2008.

162.    By at least June 2008, Fifth Third launched a program entitled "You Have Options," designed to reach distressed borrowers in danger of default.  On June 9, 2008, Fifth Third completed its $1.1 billion acquisition of First Charter Corp., adding 57 branches in the Southeast, primarily in North Carolina.  As noted above, First Charter Corp. was involved in subprime residential lending.

163.    As a result of Defendants' inaccurate statements and omissions, the Company's Stock traded at artificially inflated prices during the Class Period.  However, Defendants failed to take any action to protect Plan participants from losses, as Fifth Third's financial condition deteriorated.

**D.    <u>The Truth Emerges</u>**

164.    On June 18, 2008, the Company announced that, to cope with mounting credit losses because of the deterioration of the credit quality of the company's Tier 1 capital due to the Company's exposure to the housing market crisis, it would slash its quarterly dividend 66% and needed to raise at least $2 billion in additional capital.  Additionally, the Company expected to set aside $700 to $725 million for loan and lease losses and to incur $340 to $350 million of net

charge-offs in the second quarter of 2008.  Further, the Company announced that it expected its loan loss reserves to grow and its charge-offs in 2009 to be higher than the expected 1.6% to 1.65% in 2008.

165.    The Company said that it would sell $1 billion convertible preferred shares and raise at least $1 billion more in capital from selling some of its "non-core" subsidiaries over the next several quarters.  This announcement came merely one month after defendant Kabat told investors on a conference call that he did not foresee the need to raise significant common equity.

166.    Further, the Company revealed that earnings could be as little as 1 to 5 cents per share, whereas analysts surveyed by Bloomberg had, based on the Company's prior representations as to its financial performance, expected an average of more than 40 cents per share.  Elizabeth Stanton, *U.S. Stocks Fall on FedEx's Loss, Fifth Third's Dividend Cut*, Bloomberg.com, dated June 18, 2008.

167.    Essentially, the Company was suffering increasing credit losses, particularly in its residential real estate, commercial mortgage and commercial construction portfolios in Florida and Michigan.

168.    Fifth Third also revealed that it could incur a $250 million charge over its accounting for leveraged leases.

169.    At least one analyst noted that the Company had over-stretched itself with its untimely $1.1 billion acquisition of First Charter Corp. and acquisitions in Florida.  Jonathan Stempel, *Fifth Third to Raise $2 bln Capital, Cut Dividend*, Reuters.com, dated June 18, 2008.

170. Additionally, the Company announced major changes in its leadership. It replaced George A. Schaefer, Jr. with defendant Kabat as Chairman of the Board, and named defendant Hackett as its lead director.

171. Defendant Kabat admitted, "Our bottom line results won't meet our expectations. We are not satisfied."

172. The Company also announced the cost of uncollectible loans in 2009 would rise well above 2008 levels – thereby substantiating the ever increasing (though undisclosed) negative trends pressuring the Company.

173. These disclosures also indicated that the Company's Tier 1 capital was under pressure, requiring immediate support.

174. Following the June 18, 2008 announcement, which contrasted sharply to the Company's earlier Class Period statements, Fifth Third Stock dropped as much as 27% from the previous day's closing at $12.73 and closed at $9.26 per share on very heavy trading volume on June 18, 2008.

175. On July 22, 2008, Fifth Third again surprised the market by posting its first loss in at least nine years. The Company reported a second quarter loss of $202 million, or 37 cents per share, compared a profit of $376 million, or 69 cents per share, during the second quarter of 2007. Further, the Company revealed that it was setting aside additional money to cover bad debts in distressed housing markets, including Florida and Michigan. Shortly thereafter, July 23, 2008, Fifth Third's largest shareholder, Cincinnati Financial Corp., sold more than half of its holdings in Fifth Third Stock.

176. On October 21, 2008, Fifth Third announced a second consecutive quarterly loss. The Company announced a Third Quarter net loss of $56 million, or 14 cents a share, compared

with a profit of $325 million, or 61 cents a share a year earlier.  Defendant Kabat stated, "We are not immune to disruptions in the capital markets and weakening economic conditions."

177.    On January 22, 2009, Fifth Third Stock dropped to its lowest level in 22 years after announcing a third consecutive quarterly loss due to "bad loans" and a $965 million write down.  The Company's Stock price dropped 29% from $3.99 per share on January 21, 2009 to $2.85 per share on January 22, 2009 after the company announced a fourth quarter net loss of $2.14 billion, or $3.82 a share, compared with a profit of $16 million, or 3 cents a share a year ago.

178.    As a result, Fifth Third suspended bonuses, slashed its quarterly dividend to a penny.  As a further indication of the Company's weakened financial condition, it sold $3.4 billion in preferred shares to the U.S. government's Troubled Asset Relief Program ("TARP").  TARP allows the United States Department of the Treasury to purchase or insure up to $700 billion of "troubled" assets.  "Troubled assets" are defined as:

> (A) residential or commercial mortgages and any securities, obligations, or other instruments that are based on or related to such mortgages, that in each case was originated or issued on or before March 14, 2008, the purchase of which the Secretary determines promotes financial market stability; and (B) any other financial instrument that the Secretary, after consultation with the Chairman of the Board of Governors of the Federal Reserve System, determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such determination, in writing, to the appropriate committees of Congress.

*See A Congressional Budget Office Report: The Troubled Asset Relief Program: Report on Transactions Through December 31, 2008,* at 1 January 20, 2009.

179.    Defendant Kabat stated in a press release on January 22, 2009 that "[e]conomic conditions have deteriorated across our footprint and have placed both our consumer and commercial loan portfolios under significant stress."

180.    David George, a Robert W. Baird & Co. analyst, said about the Company:  "Core asset quality trends continue to deteriorate, and we simply are having an increasingly difficult time justifying buying the stock if we had a clean slate."  As a result, George cut his rating from "outperform" to "neutral."

181.    Further, Argus downgraded Fifth Third to "Sell" from "Hold" after the Fourth Quarter results were much worse than expected.  Argus was not confident that Fifth Third would survive the credit crisis and suggested that either an FDIC seizure or a government-assisted takeover by another bank is likely.

182.    On February 2, 2009, Bloomberg reported that in January 2009, Cincinnati Financial Corp. sold its remaining shares of Fifth Third Stock after the Company announced in December 2008 that it cut its dividend.  *See* Bloomberg, *Cincinnati Financial Sells All Fifth Third Holdings*, dated February 2, 2008.

183.    On March 30, 2009, the Company announced Fifth Third and Advent International entered into a master investment agreement pursuant to which Advent will purchase a majority interest in Fifth Third's processing business.  The purpose of the investment agreement was to raise much needed capital – about $1.2 billion in tangible common equity and Tier 1 capital.

184.    On April 14, 2009, Bloomberg reported that Fifth Third Securities Inc. was fined $1.75 million by the Financial Industry Regulatory Authority (FINRA) and ordered to pay customers $260,000 for violations in selling variable annuity products that are used as retirement savings accounts.  According to FINRA, Firth Third made 250 unsuitable variable annuity trades, from January 2004 through December 2006.  *See* Bloomberg, *Fifth Third Securities Fined $1.75 Million for Annuity Sales*, dated April 14, 2009.

185.    As described further herein, Defendants, as fiduciaries of the Plan, were obligated to ensure that the Plan's investment alternatives—including the Fifth Third Stock Fund—were prudent investments for the Plan's assets.  However, Defendants failed to do so, to the substantial detriment of the Plan and its participants.

186.    Since the beginning of the Class Period, on July 19, 2007, through the present, the Plan's imprudent investments in Fifth Third Stock have been decimated, as indicated below:



*Source:* http://www.bigcharts.com.

**E.    Defendants Knew or Should Have Known That Fifth Third Stock Was an Imprudent Investment For The Plan, Yet Mislead Plan Participants**

187.    During the Class Period, Defendants knew or should have known that the Company's stock was an imprudent Plan investment, due to: (a) the Company's exposure to certain poorly performing real estate markets, including Florida and Michigan, and the extent to which this exposure was materially increasing; (b) the Company's growing exposure to late payments and defaults on mortgages and other non-performing loans, and the extent to which

this exposure was materially increasing; (c) the extent of the decline in the quality of the Company's Tier 1 capital base; (d) the deteriorating credit trends and increasing expenses, including negative trends, in the Company's consumer loan portfolio, including the extent of the increase in late payments and defaults; (e) the negative trends in the Company's home equity and commercial construction loans, and the extent to which there was a decrease in the value of the underlying assets and an increase in late payments and defaults; (f) the fact that, as a consequence of the above, the Company's stock price was artificially inflated; and (g) the fact that heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants. Despite actual or constructive knowledge of these facts, Defendants did nothing to protect the heavy investment of Plan participants' retirement savings in Fifth Third Stock.

188.   As a result of the enormous erosion of the value of Company stock, the Plan's participants, the retirement savings of whom was heavily invested in Fifth Third Stock, suffered unnecessary and unacceptable losses.

189.   Through their high ranking positions within the Company, Defendants knew or should have known of the existence of the above-mentioned problems.

190.   Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems within the mortgage and housing markets, the Company stock price would suffer and devastate participants' retirement savings once the truth became known.  Yet Defendants failed to take any steps to protect the Plan and its participants from foreseeable losses.

191.   Defendants also knew or should have known that, as a result of the omissions made, or failed to be corrected, by Defendants, Plan participants and beneficiaries could not

properly assess the prudence of investing in Fifth Third Stock or otherwise take steps to protect their financial interests.

192. As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in Fifth Third Stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock.

193. Defendants failed to conduct an appropriate investigation into whether Fifth Third Stock was a prudent investment for the Plan and, in connection therewith, failed to provide Plan participants and beneficiaries with information regarding Fifth Third's problems so that participants could make informed decisions regarding whether to include Fifth Third Stock in the Plan.

194. In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

195. An adequate (or even cursory) investigation would have revealed to a reasonable fiduciary that investment by the Plan in Fifth Third Stock was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

196. Because Defendants knew or should have known that Fifth Third Stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and their participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Fifth Third Stock.

197.    Defendants had available to them several different options for satisfying this duty, including, among other things: discontinuing further contributions to and/or investment in Fifth Third Stock under the Plan; divesting the Plan of Fifth Third Stock; making appropriate public disclosures as necessary; consulting with the DOL or independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Fifth Third Stock.

198.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's investment in Fifth Third Stock.  In fact, the Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as Fifth Third's problems came to light.

## F.    Defendants Suffered from Conflicts of Interest

199.    As ERISA fiduciaries, Defendants were required to manage the Plan's investments, including the investment in Fifth Third Stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries.  This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

200.    Conflicts of interest arise when a company that invests plan assets in company stock founders. As the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other.  As courts have made clear, "[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions." *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir.1992) (citation omitted). Fiduciaries must avoid

"placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

201.    Fifth Third's SEC filings, including proxy statements, during the Class Period make clear that a significant percentage of the Company's officers' and directors' compensation is stock-based.  *See* Fifth Third Definitive Proxy Statement, Form 14A, dated March 10, 2009 ("2009 Form 14A").

202.    For example, Defendant Kabat, along with other Company Board of Directors, has the right to acquire the shares of Company stock upon the exercise of stock options and stock appreciation rights, respectively.  The aggregate number of shares issuable upon the exercise of currently exercisable (or exercisable within 60 days), but unexercised, stock options and stock appreciation rights held by the Executive Officers who are not also Directors or nominees is 1,441,970.  *See* 2009 Form 14A at 5.

203.    Defendant Kabat received stock awards for 2008 and 2007 in the amount of $814,523 and $704,985, respectively.  He also received option awards for 2008 and 2007 in the amount of $1,210,135 and $1,486,770, respectively.  *See id.*

204.    Defendant Carmichael received stock awards for 2008 and 2007 in the amount of $389,640 and $494,395, respectively.  He also received option awards for 2008 and 2007 in the amount of $564,310 and $710,137, respectively.  *See id.*

205.    Defendant Sullivan received stock awards for 2008 and 2007 in the amount of $216,997 and $270,775, respectively.  He also received option awards for 2008 and 2007 in the amount of $ 334,403 and $579,409, respectively.  *See id.*

206.    Further, according to the Fifth Third Definitive Proxy Statement, Form 14A, dated March 6, 2008 ("2008 Form 14A"), under the heading "Base Salary," "[s]alary increases are based on the Company's overall performance and the executives attainment of individual objectives . . . ."  The "Pay for Performance" section of the Proxy Statement provides that the certain Defendants' "compensation is based on individual, division and Company performance," including "Growth in core deposits, loans, fees, total revenue, net income and earnings per share" and "stock price growth and price/earnings ratio."

207.    Further, under the heading "2007 Long-term Equity-based Compensation Awards," the 2008 Form 14A provides that executive compensation is based in part on the "Company's revenue and expense results."

208.    Certain Defendants' compensation was directly tied to the performance of the Company and the price of Fifth Third Stock.  Accordingly, certain Defendants were motivated to inflate the perceived success of the Company and boost its apparent performance in order to increase their salaries and incentive compensation.

209.    Although some Defendants may have had no choice in tying their compensation to Fifth Third Stock (because compensation decisions were out of their hands), all Defendants had the choice of whether to keep the Plan's participants' and beneficiaries' retirement savings invested in Fifth Third Stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

210.    Finally, any signal to the market that the Company was not a sound, long term investment, such as the Plan's divestiture of Fifth Third Stock, would have called into question Defendants' job performance as corporate officers.  Rather than have anyone question their

soundness as leaders of Fifth Third, Defendants chose to remain silent and let the Plan continue to hold and acquire Fifth Third Stock.

211.    These conflicts of interest put Defendants in the position of having to choose between their own interests as directors, executives, and stockholders, and the interests of the Plan's participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

212.    While the above Defendants protected themselves, they stood idly by as the Plan lost millions of dollars because of its investment in Fifth Third Stock.

**G.    Defendants' Actions/Inactions Concealed Their Fiduciary Breaches**

213.    Defendants' breaches of their ERISA-mandated fiduciary duties of prudence and loyalty, by their very nature, were self-concealing and could not be reasonably discovered through due diligence of the Plan's participants during the Class Period.  Further, certain of Defendants' alleged breaches, including breaches of their duties to speak truthfully and provide material information to Plan participants regarding the propriety of investing Plan assets in Fifth Third stock during the Class Period, also actively served to conceal Defendants' primary breach of their duty of prudence.  Defendants' misleading, inaccurate and incomplete statements regarding the true financial health and prospects of the Company served to hide from Plan participants, *inter alia*: (a) the factual predicates underlying Plaintiffs' claims of the imprudence of Fifth Third Stock during the Class Period and (b) the failure/absence of any investigation into the prudence of investing Plan assets in Fifth Third Stock during the Class Period.  Therefore, Plaintiffs claims are timely brought under all applicable prongs of ERISA § 413 (1)-(2), 29 U.S.C. § 1113 (1)-(2).

# VIII.   THE RELEVANT LAW

214.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a plan participant for relief under ERISA § 409, 29 U.S.C. § 1109.

215.    An individual may be a fiduciary for ERISA purposes either because the plan documents explicitly describe fiduciary responsibilities or because that person functions as a fiduciary.  *See* U.S.C. § 1002(21)(A); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *Concha v. London*, 62 F.3d 1493 (9th Cir. 1995).

216.    When fiduciaries put the interests of the company or their own interests ahead of the interests of plan participants, they violate ERISA.  A fiduciary may, therefore, be personally liable to plan participants for breaching the responsibilities, obligations, or duties imposed under the plan and must restore any losses to the plan with any profits the fiduciary made through use of plan assets.  ERISA § 409(a), 29 U.S.C. § 1109(a).

217.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part:

> A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

218.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

219.    A fiduciary breaches the duty of loyalty when the fiduciary withholds information that the fiduciary knows or should know a participant would need to make an informed decision. Therefore, the duty of loyalty includes:  (i) a negative duty not to misinform; (ii) an affirmative

duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

220.    A fiduciary must avoid conflicts of interest and resolve them promptly when they do occur.  As such, a plan fiduciary must always administer a plan with an exclusive purpose or "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  *Bierwirth*, 680 F.2d at 271.

221.    A plan fiduciary is also responsible for the investment and monitoring of plan investments, ensuring that only prudent investments are offered as plan options, and monitoring such investments to ensure that they remain prudent and suitable for the plan. *In re ADC Telecomm, ERISA Litig.*, No. 03-2989, 2004 U.S. Dist. LEXIS 14383 (D. Minn. July 26, 2004). This includes the duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan to ensure that each investment is a suitable option for the plan.

222.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co- Fiduciary," provides, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)    if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

223.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of a fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given decision, such as the role of company stock in a plan. In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary did not participate in a breach, if he knows of a breach, he must take steps to remedy it.

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

224.    Plaintiffs bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a), and for other equitable and remedial relief..

## IX.    CAUSES OF ACTION

### COUNT I:

**Failure to Prudently and Loyally Manage the Plans' Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)**

225.    Plaintiffs incorporate by this reference the paragraphs above.

226.    This Count alleges fiduciary breach against the following Defendants: the Company, Defendant Kabat and the Committee Defendants, (collectively, the "Prudence Defendants").

227.    As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

228.    As alleged above, the scope of the Prudence Defendants' fiduciary duties and responsibilities included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  Therefore, the Prudence Defendants were directly responsible for selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan, and directing the Trustee regarding same.  The Prudence Defendants were also responsible for, among other things, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

229.    Contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan.  Specifically, during the Class Period, these Defendants knew or should have known that Fifth Third Stock was not a suitable

and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment in light of the Company's fundamental weaknesses.  Nonetheless, during the Class Period, these Defendants continued to offer Fifth Third Stock as an investment option for participant Plan contributions and, for part of the Class Period, as the sole investment receptacle for matching contributions.  They did so despite evidence that (a) First Third's operating expenses were rapidly increasing; (b) Fifth Third was undergoing higher loan losses due to its weakening credit quality; (c) Fifth Third was in need of a cash infusion to offset the undisclosed negative trends in loan losses; (d) Fifth Third's Non-Performing Assets were dangerously increasing; and (e) Fifth Third's Tier 1 capital base had declined precipitously and required a major infusion of capital.

230.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets.  However, their duties of prudence and loyalty were especially significant with respect to Fifth Third Stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in Company stock. In light of this, the Prudence Defendants were obliged to institute a regular, systematic procedure for evaluating the prudence of investment in Fifth Third Stock.

231.    Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in Fifth Third Stock, even though the Company's financial situation posed a great danger to the Plan.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to maintain investment in Fifth Third Stock under these circumstances.

232.   The Prudence Defendants' decisions regarding the Plan's investment in Fifth Third Stock described above, under the circumstances alleged herein, constituted an abuse of fiduciary discretion because a prudent fiduciary acting under similar circumstances would have made different investment decisions.  A prudent fiduciary would not have reasonably believed that continued investment of the Plan's contributions and assets in Fifth Third Stock was in keeping with the Plan settlor's expectations of how a prudent fiduciary would operate.

233.   The Prudence Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

234.   According to DOL regulations and case law interpreting the statutory provision above, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

235.   According to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

> (1)   a determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk

of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

(2) consideration of the following factors as they relate to such portion of the portfolio:

(a) the composition of the portfolio with regard to diversification;

(b) the liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

(c) the projected return of the portfolio relative to the funding objectives of the plan.

236. Given the conduct of the Company as described above, the Prudence Defendants did not act prudently when they continued to invest the Plan's assets in Fifth Third Stock because, among other reasons, these Defendants knew or should have known of and failed to investigate the failures of the Company, which included:  (a) First Third's operating expenses were rapidly increasing; (b) Fifth Third was undergoing higher loan losses due to its weakening credit quality; (c) Fifth Third was in need of a cash infusion to offset the undisclosed negative trends in loan losses; (d) Fifth Third's Non-Performing Assets were dangerously increasing; and (e) Fifth Third's Tier 1 capital base had declined precipitously and required a major infusion of capital.

237. As such, the risk associated with the investment in Fifth Third Stock during the Class Period was far above the normal, acceptable risk associated with investment in company stock.

238. Plan participants were unaware of this risk and the Prudence Defendants knew or should have known as much.

239. Given this inequity, the Prudence Defendants had a duty to avoid permitting the Plan or any participant to invest Plan assets in Fifth Third Stock.

240.    Further, knowing the Fifth Third Company Stock Fund in the Plan was not a diversified portfolio but was heavily invested in Company stock, these Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

241.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve conflicts promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. Certain Defendants were motivated to inflate the perceived success of the Company and boost its apparent performance, because the better the Company's performance and, consequently, the higher the price of the Company's stock, the larger certain Defendants' salaries and incentive compensation.  Fiduciaries laboring under such conflicts must, in order to comply with the duty of loyalty, make special efforts to assure that their decision-making process is untainted by the conflict and is made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

242.    The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by: (a) failing to engage independent advisors who could make independent judgments concerning the Plan's investment in Fifth Third Stock; (b) failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Fifth Third Stock an unsuitable investment for the Plan; (c) failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; (d) failing to disregard the impact of their duty to avoid conflicts of interest on their own compensation; and

(e) placing their own and Fifth Third's improper interests above the interests of the participants with respect to the Plan's investment in Fifth Third Stock.

243.    Moreover, a fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those who they direct or who are directed by the plan, to do so.

244.    The Prudence Defendants breached this duty by: (a) continuing to offer Fifth Third Stock as an investment option for participants of the Plan; (b) continuing to invest assets of the Plan in Fifth Third Stock rather than in cash or other short-term investment options; (c) failing to divest the Plan of imprudent Fifth Third Stock; and (d) engaging in this course of conduct when Defendants knew or should have known that Fifth Third Stock no longer was a prudent investment for participants' retirement savings.

245.    The Prudence Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information to Plan participants and beneficiaries regarding (a) the Company's overexposure to loans tied to the declining housing and construction market; (b) the Company's exposure to subprime loans through its ill-timed acquisition of First Charter Corp., a company involved with subprime residential lending; (c) the failure to implement and maintain sufficient risk management control processes; (d) the failure to properly reserve for losses; (e) the failure to properly account for and disclose its exposure to losses tied to its business operations in the subprime market; (f) the artificial inflation of Fifth Third stock caused by these circumstances; and (g) the dire financial circumstances created by

Fifth Third's subprime exposure and improper business practices.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Fifth Third Stock among Plan participants and beneficiaries and/or allowed Plan participants to follow their natural bias towards investment in employer stock by not disclosing negative material information concerning investment in Fifth Third Stock.  As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

246.    As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses.  If these Defendants had discharged their fiduciary duties by prudently investing the Plan's assets, the losses suffered by the Plan would have been minimized or avoided altogether.

247.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

248.    Pursuant to ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2), the Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II:

### Failure To Monitor Fiduciaries
### (Breaches of Fiduciary Duties in Violation of ERISA § 404
### by Fifth Third and the CEO)

249.    Plaintiffs incorporate by this reference the allegations above.

250.    This Count alleges fiduciary breach against the following Defendants: the Company and Kabat (collectively, the "Monitoring Defendants").

251. As alleged above, during the Class Period, the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

252. The scope of the Monitoring Defendants' fiduciary responsibilities includes the responsibility to appoint and remove, and thus monitor the performance of other fiduciaries. The Company exercises its plan administrator functions through the Committee Defendants with respect to the Plan. Thus, it has a duty to monitor the Committee Defendants.

253. Defendant Kabat was responsible for appointing, replacing, and monitoring the members of the Committee.

254. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

255. The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether their fiduciary appointees are properly performing their fiduciary responsibilities. In the absence of a sensible process for monitoring appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

256. Furthermore, a monitoring fiduciary must provide their fiduciary appointees with complete and accurate information that they know or reasonably should know that the fiduciary

appointees must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

257. On information and belief, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plan's investment in Fifth Third Stock if not on a broader basis, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Fifth Third Stock; (b) failing to ensure that their fiduciary appointees appreciated the true extent of Fifth Third's highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plan's investment in Fifth Third Stock; (3) failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets; and (4) failing to remove appointees whose performance was inadequate insofar as they continued to allow and maintain investments in Fifth Third Stock despite their knowledge of practices that rendered Fifth Third Stock an imprudent investment during the Class Period for participants' retirement savings in the Plan.

258. As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided altogether.

259. As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

260.     Pursuant to ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III:

### Failure to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)

261.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

262.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

263.     ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty – that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

264.     Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in Fifth Third Stock.

265.     As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided altogether.

266. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses, and indirectly the Plan's participants, lost a significant portion of their retirement investments.

267. Pursuant to ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV:

### Co-Fiduciary Liability
### (Breaches of Fiduciary Duties in Violation of ERISA § 405 by all Defendants)

268. Plaintiffs incorporate by this reference the allegations above.

269. This Count alleges co-fiduciary liability against all Defendants.

270. As alleged above, during the Class Period Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

271. As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. Defendants breached all three provisions.

272. ***Knowledge of a Breach and Failure to Remedy***. ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the

circumstances to remedy the breach.  Each Defendant knew of the breaches by the other fiduciaries and made no effort to remedy those breaches.

273.    Fifth Third, through its officers and employees, was unable to meet its business goals, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices.  Thus, knowledge of such practices is imputed to Fifth Third as a matter of law.

274.    Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that Defendants were breaching their duties by continuing to maintain Plan investments in Company stock.  Yet they failed to undertake any effort to remedy these breaches.  Instead, they compounded them by downplaying the significance of Fifth Third's failed and inappropriate business practices and by obfuscating the risk that these practices posed to the Company, and, thus, to the Plan.

275.    ***Knowing Participation in a Breach***.  ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary knowing such act or omission is a breach.  Fifth Third knowingly participated in the fiduciary breaches of Defendants who failed to prudently and loyally manage the Plan in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for Plan participants.

276.    ***Enabling a Breach***.  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

277. The Monitoring Defendants' failure to monitor the Committee Defendants enabled that Committee to breach its duties.

278. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost millions of dollars of retirement savings.

279. Pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), all Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## X. CAUSATION

280. The Plan suffered millions of dollars in principal losses because Defendants imprudently invested the Plan's assets in Fifth Third Stock during the Class Period in breach of Defendants' fiduciary duties.

281. Had Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Fifth Third Stock as an investment alternative when it became imprudent, and divesting the Plan of Fifth Third Stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly the Plan participant, suffered.

## XI. REMEDY FOR BREACHES OF FIDUCIARY DUTY

282. Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Fifth Third Stock during the Class Period.

283. As a consequence of Defendants' breaches, the Plan suffered significant losses.

284.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

285.   With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investment available to them. The Court should adopt the measure of loss most advantageous to the Plan.  In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

286.   Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and interest on these amounts, as provided by law; and (5) such other legal or equitable relief as may be just and proper.

287.   Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## XII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan and Plan participants;

B.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty to the extent allowable by law;

D.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Fifth Third Stock;

E.    Actual damages in the amount of all losses the Plan suffered;

F.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

H.    An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

Dated:  September 21, 2009                Respectfully submitted,

By:  /s/  Ronald R. Parry
     Ronald R. Parry
**PARRY DEERING FUTSCHER**
**  & SPARKS, PSC**
411 Garrard Street
Covington, Kentucky 41012-2618
Email: Rparry@pdfslaw.com
Tel:  (859) 291-9000
Fax:  (859) 291-9300

**GAINEY & McKENNA**
Thomas J. McKenna
295 Madison Avenue, 4th Floor
New York, NY 10017
Tel: (212) 983-1 300
Fax: (212) 983-0383
Email:  tjmlaw2001@yahoo.com
       tjmckenna@gaineyandmckenna.com

**BARROWAY TOPAZ & KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
Email:  jmeltzer@smtk.com
Email:  eciolko@smtk.com

Robert M. Smyth
**DREW & WARD CO., LPA**
1 W. Fourth St., Suite 2400
Cincinnati, OH 45202
Tel:  (513) 621-8210
Fax:  (513) 621-5444

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of September, 2009, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which shall send notification of such filing to the email addresses of the below-listed persons:

David Thomas Bules
*dbules@kmklaw.com*

Mark K. Gyandoh
*mgyandoh@btkmc.com*

Thomas J. McKenna
*tjmlaw2001@yahoo.com*

James Eugene Burke
*jburke@kmklaw.com*

Mary C. Henkel
*mchenkel@vorys.com*

Joseph H. Meltzer
*jmeltzer@btkmc.com*

Joseph M. Callow, Jr.
*jcallow@kmklaw.com*

Dorothea K. Langsam
*dklangsam@vorys.com*

Jennifer J. Morales
*jmorales@kmklaw.com*

Edward W. Ciolko
*eciolko@btkmc.com*

James A. Maro
*jmaro@btkmc.com*

Glenn Virgil Whitaker
*gvwhitaker@vorys.com*

Danielle Marie D'Addesa
*ddaddesa@kmklaw.com*

___/s/ Ronald R. Parry_____
Ronald R. Parry